IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILTON RICHARD GARCIA, )
 )
      Petitioner, )    No. C 06-7844 CRB (PR)
 )
 vs. )    ORDER DENYING PETITION
 )    FOR A WRIT OF HABEAS
KATHY MENDOZA-POWERS, )    CORPUS
 )
      Respondent. )
_____ )

      Petitioner was convicted by a jury in the Superior Court of the State of California in and for the County of Santa Clara of rape by use of an intoxicating substance, oral copulation by use of an intoxicating substance, and false imprisonment.  On September 9, 2004, he was sentenced to six years in state prison.

      Petitioner unsuccessfully appealed his conviction to, and sought collateral relief from, the California Court of Appeal.  He also sought review from the Supreme Court of California, but on May 10, 2006, the state high court denied review.  Petitioner then filed the instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Per order filed on March 27, 2007, the court found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer to the order to show cause.  Petitioner did not file a traverse.

\\

\\

# FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

A. Prosecution Case

On July 13, 2002, Angela Doe was 28 years old and lived in Los Banos. On that day, she ate lunch between 3 and 4 p.m. Between 9 and 10 p.m., Doe left Los Banos with her friends, Amina Zeisbrich and Juliette Maldonado. When the women arrived in Gilroy, they went to a bar where Doe ate four chicken wings and drank three-quarters of a beer. They stayed at the bar for about an hour. Doe and Zeisbrich then told Maldonado that they would call her at 6 a.m. so that they could make arrangements to pick her up.

Doe and Zeisbrich went to Club Max at the Double Tree Hotel in San Jose. Zeisbrich planned to see one of the bartenders, Sonder Seymour. Defendant also worked as a bartender at Club Max. Seymour and defendant were friends.

While Doe and Zeisbrich were at the bar, Doe drank a shot of tequila and half of a mixed drink. According to Zeisbrich, Doe drank a beer and a mixed drink. Doe later told Officer William Westbrook that she had several drinks at the bar and was "quite drunk." Doe spoke briefly to defendant, who was tending bar with Seymour. According to Doe, defendant was friendly, but he was not flirting with her. Seymour thought that defendant and Doe were flirting with each other. Doe later told the police that defendant had flirted with her "throughout the night."

Seymour had access to a room at the Double Tree Hotel that night. He invited Doe, Zeisbrich, and defendant to his room after the bar closed. At this point, she did not feel the effects of the alcohol that she had consumed. Seymour, defendant, Zeisbrich, and Doe arrived at Seymour's room between 3:00 and 3:30 a.m. Seymour and defendant had brought a bottle of tequila and a bottle of vodka from the bar, and the group played drinking games. Doe drank vodka and orange juice. Though she was not sure how much she drank, Seymour estimated that she consumed about "five shots" in 45 minutes to an hour.

After the drinking games ended, Zeisbrich said that she was going outside to smoke a cigarette. Doe asked her to stay in the room, because she "didn't want the defendant to get any ideas or think anything." Zeisbrich told her that she would not be gone very long and left the room with Seymour. Zeisbrich estimated that she and Seymour were out of the room for 25 to 30 minutes. After they left, defendant poured a glass of vodka for Doe. She consumed about a quarter of the drink, which did not taste unusual. However, she later told Detective Andrew Harsany that she drank "the whole glass ." Doe put down the glass, and defendant kissed her. Doe opened her mouth "a little," and then stepped back. Defendant asked her if she had allowed him to kiss her because she liked him or because of the alcohol. Doe answered that it was the alcohol, and defendant laughed. Doe had no interest in a sexual encounter with defendant.

2

Doe went to the bathroom, where she began to [feel] dizzy and vomited "a little bit." When she returned, the door to the room had been locked and there was no one in the room. Her mental process was "very, very slow." Doe testified, "I was-I was really confused. It seemed like I took forever trying to figure out how the door was locked-if I was in the bathroom and I didn't lock it and nobody else was in the room, how it became locked." At that point, defendant exited the closet. Doe was "still confused." When she saw him exit the closet, it "was another thing to think about, why he was in the closet." Doe "felt unbalanced. [She] was dizzy, but everything started to seem like it was like-kind of like slow motion." It took a long time to "move [her] body." Doe went to unlock the door, but defendant "stopped [her] hand from opening the door and said to just leave it locked." Defendant then grabbed her arm and led her to the bed. Doe was thinking in "slow motion." She testified, "I was so slow that I was still thinking about the door being locked and why he was still-why he was in the closet, and was just kind of thinking slow motion, like, you know, kind of confused." She further explained, "I didn't have, like, I guess, control of my body. I felt, like, dizzy. I felt-I don't even know how to explain it. Kind of like where you start, I guess, losing sensation."

Defendant removed his shirt. As he and Doe sat on the bed, she told him that "there wasn't going to be anything like that." Her comment meant that she was not interested in sex. When Doe said that she was not feeling well, defendant told her that she would "feel a lot better in a little while." Defendant took off his clothes, and then removed Doe's pants and underwear. When she moved back and said, "No," defendant moved her legs apart. He orally copulated her, and she told him no again and moved towards the back of the bed. She also "pulled his hair and pushed his head back away" from her. Doe felt "really heavy" and it was harder for her to move. Defendant told her not to worry, because he had a condom. After his penis entered her vagina, she "moved back away from him again and told him no."

When there was a knock on the door, defendant got up and threw Doe's clothes at her. Since her body still felt heavy, it was difficult for her to put on her clothes. Defendant then opened the door, and Zeisbrich and Seymour entered the room. Defendant was wearing pants, but not a shirt. Doe was lying on her side in bed. Zeisbrich spoke to her, but she did not respond. Zeisbrich, Seymour, and defendant then joined Doe in bed.

Doe felt nauseous and went to the bathroom. It was very difficult for her to walk, as if she weighed "400 pounds." She could not walk in a straight line. She "wasn't sure if what happened really happened." She was "still confused." She testified, "I couldn't-I couldn't really talk at that time. I tried to get the words out, and I couldn't really-it was, like, faint. And I was telling him to get out, but I know I was like, whispering. I know I couldn't-like, I had, like, no energy, like, where I was losing my energy. [¶] And he walked in. And I still was getting sick, so he was holding my hair back because I was throwing up." She could "barely" stand up, and was "like a zombie." Defendant told her that she needed a shower, removed her clothes, and put her in the shower. After he began touching her breasts and washing her off, Doe lost control of her body and found herself on the floor.

3

She could not feel her body and "could barely see." When defendant asked if he could "mess around again," she could not speak. She could not move and thought that she was dying. She told Westbrook that defendant had sexual intercourse with her on the floor.

Zeisbrich entered the bathroom, and defendant told her that nothing had happened. He also told Zeisbrich that he had to leave to watch his children, though earlier in the evening he had said that his children were with their mother. After Zeisbrich thanked him for taking care of Doe, he quickly left with the bottle of vodka.

According to Zeisbrich, Doe was very cold to the touch, shivering, nonresponsive, and very heavy. Her eyes were staring, and "tears were just coming out." Doe could not stand on her own. Seymour thought that Doe was suffering from alcohol poisoning. He was concerned about losing his job, so he told Zeisbrich that she should take Doe to the car and call an ambulance or 911. He also told Zeisbrich that if Doe started throwing up, she would be fine.

While Zeisbrich and Seymour were dressing Doe, defendant called. Doe heard Seymour say, " 'What did you give her?' or " 'How much did you give her?' " Zeisbrich heard Seymour say, " 'How much drink did you give her? What happened, when we were gone, in that room?' " Defendant told Seymour to remove the tequila from the room, because they had taken it without permission. Since Doe was unable to walk, Zeisbrich and Seymour carried her to the car. When they reached the car, Doe vomited. Doe felt "really heavy," but she began to have control over her body. Zeisbrich called Maldonado and arranged to pick her up.

As Zeisbrich was driving, Doe vomited two or three times. Zeisbrich picked up Maldonado, who thought that "there was something wrong" with Doe. When they reached Los Banos, Zeisbrich dropped off Maldonado. She then drove home, and invited Doe to come in. Doe refused to speak to her and left in her car.

Doe was "pissed off" at Zeisbrich, because she had thanked defendant for taking care of her. Doe still felt dizzy, but believed that she was able to drive because she could move and speak. She drove less than a mile and called her friend. She then decided to drive to the hospital. Doe believed that defendant had slipped a drug into her drink, because she previously "had a lot more to drink than that night and never had any kind of effect like that" in her life.

Judy Wooten, a family nurse practitioner, examined Doe. Doe was tearful. Wooten observed no injuries to Doe's pelvic area. Wooten suggested that a blood sample should be drawn, but the attending physician declined to order one.

At 10:30 a.m. on July 14, Westbrook received a call from the hospital. He interviewed Doe, who was crying. She indicated that she had been raped in both the bedroom and the bathroom. She did not mention oral copulation or suggest that she had been drugged.

4

Alice King, a criminalist with the Santa Clara County Crime Laboratory, testified as an expert on "the symptoms and effects of alcohol and date-rape drugs." Rohypnol is an anesthetic that causes an individual to "feel drowsy, confused, disoriented," and have problems with muscle coordination and memory. GHB causes drowsiness, nausea, visual and muscle impairment, and memory loss. An individual will feel the effects of GHB, which alcohol intensifies, within 10 to 20 minutes. The effects will wear off within two to four hours. Ketamine is an anesthetic, which causes hallucinations. It also causes the individual to "have a lot of strength." In King's opinion, Doe's symptoms were not consistent with the use of alcohol alone. Based on Doe's "visual disturbance," she made "an educated guess" that Doe had ingested GHB. Based on the assumption that Doe had four or five drinks in the hotel room, King believed that Doe's highest alcohol level was about .15.

On December 10, 2002, Harsany interviewed defendant. Defendant indicated that Doe was "pretty drunk" when they went to the room. Doe then had two shots of tequila. Defendant stated that he kissed Doe, but denied that they had sex or that he had put anything in her drink. However, after Harsany told defendant that a DNA test would implicate him, defendant admitted that he had engaged in oral copulation and sexual intercourse. Defendant also stated that Doe had consented to the sex acts. He explained that he had initially denied engaging in sex with Doe, because he did not want to involve his family.

Harsany also interviewed Doe. Doe said that she had initially reported that sexual intercourse occurred in the bathroom, but that she now was not sure. Her body had been numb and she saw defendant down by her feet, but she was not sure "what was going on."

B. Defense Case

Nancy Avelar, a banquet supervisor at the Double Tree Hotel, dated defendant for two to three months. Defendant never tried to take sexual advantage of her through the use of alcohol or drugs.

Jane Uyemura, a bartender at the Double Tree Hotel, knew defendant. He once made a sexual pass at her while they were drinking. When she indicated that she was not interested, defendant "backed off."

Christina Koon, who was also a bartender at the Double Tree Hotel, had known defendant for six years. She had never seen him act in an inappropriate manner with a female customer.

Defendant testified on his own behalf. He had worked as a bartender at the Double Tree Hotel for almost ten years. He did not believe that Doe was intoxicated while she was at the bar. He explained that he had given contrary information to Harsany, because he had been "afraid." Defendant and Doe spoke for about five minutes at the bar. They showed each other photographs of their children. When he went to Seymour's room, he did not anticipate that he would have sex with Doe.

5

Doe drank "roughly four" drinks in about 20 minutes during the drinking games in the hotel room. Each drink held "about an ounce and a half" or a "little bit more" of alcohol. Doe was "pretty buzzed." After Zeisbrich and Seymour left the room, defendant and Doe danced without music. Doe drank a sip of vodka, but defendant denied that he had put anything in the drink. Defendant and Doe then kissed.

Doe walked normally to the bathroom. While she was in the bathroom, defendant locked the door and hid in the closet as a joke. He did not try to prevent her from unlocking the door. They then walked to the bed where he orally copulated her. They also had sexual intercourse. Doe never told him to stop, and he believed that the sex was consensual. Doe was not confused and spoke clearly at this time.

When Doe became sick in the bathroom, defendant helped her. They did not engage in any sex acts in the bathroom. Defendant conceded that he had been rude to leave when she became sick. However, he did not want the mother of his children to discover his infidelity. He also conceded that he lied to Harsany, though he eventually "told him most of the truth."

Anne Imobersteg testified as an expert on the effects of alcohol and anesthetic substances. She stated that GHB has a salty taste, and does not cause paralysis. A dose of two grams induces a very deep sleep. The effects of GHB will last about an hour and a half, but its effects will last for 20 to 30 hours if combined with alcohol. In Imobersteg's opinion, Doe had not ingested GHB, because her blood pressure was high and her respiration rate was normal at the hospital, and her symptoms were not consistent with the use of GHB. Imobersteg also did not believe that Doe had taken rohypnol, because she remembered too much of the incident. Imobersteg did not think that Doe had taken ketamine, because she did not have the hallucinations that are associated with this drug.

Imobersteg also testified regarding the concept of "critical judgment." She defined it as the judgment that is reached after an individual weighs the ramifications of the decision being made. In her opinion, an individual is capable of critical judgment even though he or she has a blood alcohol level of .13 to .15. However, Imobersteg did not believe that Doe's blood alcohol level was as low as .13 due to her symptoms of immobility and coldness. These symptoms were more consistent with a blood alcohol level of .18.

*People v. Garcia*, No. H027934, slip op. at 1-5 (Cal. Ct. App. Jan. 23, 2006) (footnote omitted) (Resp't Ex. C).

## DISCUSSION

I.   Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is

1    in custody in violation of the Constitution or laws or treaties of the United States." 28

2    U.S.C. § 2254(a).

3         The writ may not be granted with respect to any claim that was adjudicated on the

4    merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

5    decision that was contrary to, or involved an unreasonable application of, clearly

6    established Federal law, as determined by the Supreme Court of the United States; or (2)

7    resulted in a decision that was based on an unreasonable determination of the facts in

8    light of the evidence presented in the State court proceeding." *Id.* § 2254(d). The first

9    prong applies both to questions of law and to mixed questions of law and fact, *Williams*

10   *(Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to

11   decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340

12   (2003).

13        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

14   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

15   question of law or if the state court decides a case differently than [the] Court has on a set

16   of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. "Under the

17   'unreasonable application clause,' a federal habeas court may grant the writ if the state

18   court identifies the correct governing legal principle from [the] Court's decisions but

19   unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

20   federal court on habeas review may not issue the writ "simply because that court

21   concludes in its independent judgment that the relevant state-court decision applied

22   clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the

23   application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

24        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

25   determination will not be overturned on factual grounds unless objectively unreasonable

26   in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at

27

28                                              7

1  340.

2      When there is no reasoned opinion from the highest state court to consider the

3  petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*,

4  501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir.

5  2000).

6  II.    Claims

7      Petitioner raises six claims for relief under § 2254: (1) he was denied due process

8  under the Fifth and Fourteenth Amendments because his rape and oral copulation

9  convictions were not supported by substantial evidence; (2) he was denied due process

10 under the Fifth and Fourteenth Amendments due to the trial court's failure to modify

11 CALJIC No. 10.65; (3) he was denied due process under the Fifth and Fourteenth

12 Amendments due to the trial court's error in giving CALJIC Nos. 3.30 and 4.36; (4) he

13 was denied due process under the Fifth and Fourteenth Amendments because the trial

14 court gave an instruction on an erroneous theory of liability for false imprisonment; (5) he

15 was denied effective assistance of counsel under the Sixth and Fourteenth Amendments

16 due to trial counsel's failure to seek modification of CALJIC No. 10.65; and (6) he was

17 denied effective assistance of counsel under the Sixth and Fourteenth Amendments due to

18 trial counsel's failure to make several meritorious objections to the victim restitution

19 order.

20      A.    Sufficiency of the Evidence

21      Petitioner claims that his due process rights were violated because there was

22 insufficient evidence to support his rape and oral copulation by intoxication convictions.

23 Specifically, he claims that there was insufficient evidence to prove that Doe's level of

24 intoxication deprived her of the capacity to give consent. *See* Pet. Attach. C at 14-20.

25      The Due Process Clause "protects the accused against conviction except upon

26 proof beyond a reasonable doubt of every fact necessary to constitute the crime with

27

28                                          8

which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim which, if proven, entitles him to federal habeas relief. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether the evidence established guilt beyond a reasonable doubt. *Id.* at 318-19; *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court determines only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. "The *Jackson* standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Sarausad v. Porter*, 479 F.3d 671, 678-79 (9th Cir. 2007) (quoting *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004)).

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *Id.* at 957-58.

After 28 U.S.C. § 2254(d), a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir.

9

1    2005).  A federal habeas court must ask whether the operative state court decision

2    "reflected an 'unreasonable application of *Jackson* and *Winship* to the facts of the case."

3    *Id.* at 1275 (quoting 28 U.S.C. § 2254(d)(1)).

4        Under California law, "[r]ape [by intoxication] is an act of sexual intercourse

5    accomplished with a person not the spouse of the perpetrator . . . [w]here [the] person is

6    prevented from resisting by any intoxicating or anesthetic substance, or any controlled

7    substance, and this condition was known, or reasonably should have been known by the

8    accused."  Cal. Penal Code § 261(a)(3).  Similarly, oral copulation by intoxication is an

9    act of oral copulation "where the victim is prevented from resisting by any intoxicating or

10    anesthetic substance, or any controlled substance, and this condition was known, or

11    reasonably should have been known by the accused . . . ."  Cal. Penal Code § 288a(i).

12    Under both statutes, the State has the burden of proving that the victim was not "capable

13    of exercising the degree of judgment a person must have in order to give legally

14    cognizable consent."  *People v. Giardino*, 82 Cal. App. 4th 454, 462 (2000).

15        In the present case, the California Court of Appeal held that there was sufficient

16    evidence to support petitioner's rape and oral copulation by intoxication convictions.

17    Reasoning that "the trier of fact may believe and accept as true only part of a witness's

18    testimony and disregard the rest," the court concluded that "[h]ere the jury rejected Doe's

19    testimony that she was capable of exercising judgment" and "found credible other

20    portions of her testimony . . . which established that she lacked the capacity to give her

21    consent."  Resp't Ex. C at 6 (quotation omitted).

22        The California Court of Appeal's application of *Jackson* was not objectively

23    unreasonable.  *See* 28 U.S.C. § 2254(d).  Viewing the record in the light most favorable to

24    the prosecution, a rational trier of fact could have found beyond a reasonable doubt the

25    element of the crimes of rape and oral copulation by intoxication that Doe lacked the

26    capacity to give legally cognizable consent to the sex acts.  *See Jackson*, 443 U.S. at 319.

27

28                              10

1        In arguing that the prosecution failed to prove that Doe lacked the capacity to

2   consent, petitioner highlights Doe's testimony that her "mind [was] clear enough so that

3   [she] could make a decision that [she] didn't want to have sexual contact." Pet. Attach. C

4   at 17-18 (citing RT 204). But as the court of appeal properly noted, the jury reasonably

5   could have rejected Doe's statement that she was capable of exercising judgment and

6   instead credited the ample other testimony which indicated that she lacked such capacity.

7   *Accord Jackson*, 443 U.S. at 326. That other testimony includes Doe's consumption of

8   alcohol throughout the night in question, *see* RT 58-59, 62, 74-75, 80; her slow mental

9   processing before and during the sex acts, *see* RT 84-85, 97, 103, 106; and her severe

10  symptoms in the bathroom after the sex acts, including inability to speak or stand and loss

11  of feeling and control, *see* RT 108-13. It is not up to this court to revisit the jury's

12  credibility determinations. *See Bruce*, 376 F.3d at 957-58.

13       Petitioner also points to parts of Doe's testimony that indicate that she told

14  petitioner through words and conduct that she did not want to have sex. Immediately

15  prior to the sex acts, Doe told petitioner that "there wasn't going to be anything like that,"

16  by which she meant "there wasn't going to be any sex," RT 98; and during the sex acts,

17  she "moved back away" from petitioner, "pulled his hair and pushed his head back away,"

18  and repeatedly said "no," RT 101-03. Doe's ability to manifest her decision not to have

19  sex, petitioner argues, demonstrates that she must have possessed the capacity to consent.

20  But petitioner fails to account for the distinction, noted by the prosecutor, between being

21  able to say "no" to sex and being able to give affirmative consent. The prosecutor argued

22  in her closing statement that being "able to say no and move back a little bit" is "instinct,"

23  or "survival still kicking in," while "[t]o be able to consent, to be able to say yes, that's

24  reasoning." RT 981-82. A rational juror could have agreed with this distinction and

25  come to the conclusion that while Doe did clearly tell petitioner "no," she lacked the

26  capacity for the reasoned judgment necessary to say "yes."

27

28                                     11

1    In sum, because the record shows that a rational trier of fact could have found that

2    Doe lacked the capacity to give legally cognizable consent beyond a reasonable doubt, the

3    California Court of Appeal's rejection of petitioner's claim cannot be said to be an

4    objectively unreasonable application of *Jackson*.  *See* 28 U.S.C. § 2254(d).  Petitioner's is

5    not entitled to federal habeas relief on his insufficient evidence claim.

6    B.    Instructional Error in Giving Unmodified CALJIC No. 10.65

7    Petitioner claims that the trial court's failure to instruct the jury with a

8    modified version of CALJIC No. 10.65 denied him due process of law.  *See* Pet. Attach.

9    C at 20-24.  Under California law, "[a]n honest and reasonable but mistaken belief that a

10   sexual partner is not too intoxicated to give legal consent to sexual intercourse is a

11   defense to rape [and oral copulation] by intoxication."  *Giardino*, 82 Cal. App. 4th at 472.

12   Here, the trial court instructed the jury pursuant to CALJIC No. 10.65: "In the crime of

13   forcible rape and/or oral copulation by force and threats . . . a reasonable and good-faith

14   belief that there was voluntary consent is a defense to such charge."  RT 954-55.

15   Petitioner argues that CALJIC No. 10.65 erroneously instructed the jury to determine

16   whether he reasonably believed that Doe *consented* rather than whether he reasonably

17   believed that Doe had the *legal capacity* to consent.  Pet. Attach. C at 21-22.

18   To obtain federal habeas relief for error in the jury charge, petitioner must show

19   that the error "so infected the entire trial that the resulting conviction violates due

20   process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414

21   U.S. 141, 147 (1973)).  The error "'may not be judged in artificial isolation,' but must be

22   considered in the context of the instructions as a whole and the trial record."  *Id.* (quoting

23   *Cupp*, 414 U.S. at 147).  Here, where an ambiguous or potentially defective instruction is

24   at issue, the court must inquire "'whether there is a reasonable likelihood that the jury has

25   applied the challenged instruction in a way' that violates the Constitution."  *Id.* at 72 & n.4

26   (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

27

28                                          12

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that a constitutional error has occurred. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998). If constitutional error is found, the court also must determine that the error "'had a substantial and injurious effect or influence in determining the jury's verdict'" before granting habeas relief. *Id.* at 145 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The California Court of Appeal, appropriately "viewing the instructions as a whole," concluded that CALJIC No. 10.65 did not mislead the jury because the trial court also instructed the jury pursuant to CALJIC No. 1.23.2. Resp't Ex. C at 7. CALJIC 1.23.2 states in relevant part: "[A]n essential element of the [crimes of rape and oral copulation by intoxication] is that the alleged victim was prevented from resisting the act by an intoxicating or anesthetic substance or any controlled substance. 'Prevented from resisting' means that as a result of intoxication, the alleged victim lacked the legal capacity to give consent." RT 950. The court of appeal reasoned:

> Here the jury was instructed that an element of rape and oral copulation was the victim's lack of capacity to give consent, that is, her inability to exercise reasonable judgment. A victim who lacks the capacity to give consent cannot voluntarily give her consent. The jury was also instructed that a defendant lacked the requisite criminal intent if he had a reasonable belief that the victim had voluntarily given her consent. Thus, the instructions told the jury that defendant would not have a reasonable belief that Doe consented if he knew she was too intoxicated to give her consent. Accordingly, the trial court did not err.

Resp't Ex. C at 7 (footnote omitted).

The California Court of Appeal's rejection of petitioner's claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent, nor did it involve an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). An instructional error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial

record. *Estelle*, 502 U.S. at 72. The court of appeal correctly noted that CALJIC No. 1.23.2, in instructing that an essential element of the crimes of rape and oral copulation by intoxication is that the alleged victim lacked the capacity to consent, mitigated CALJIC No. 10.65's misleading focus on consent over capacity to consent. But other jury instructions, as well as counsel's closing arguments, were perhaps more important than CALJIC No. 1.23.2 in curing CALJIC 10.65's deficiency.

First, in the context of giving the jury instructions, the trial court re-read the counts of rape and oral copulation by intoxication to the jury. Both counts charged that the victim "was prevented from resisting by an intoxicating and anesthetic substance and a controlled substance, and this condition was known or reasonably should have been known by the defendant." RT 946-47. The counts themselves informed the jury that, in order to find petitioner guilty, the jury had to find that petitioner knew or should have known that Doe lacked the capacity to consent.

Second, the trial court instructed the jury pursuant to CALJIC Nos. 10.02 and 10.13, both of which clearly state that an element of the crimes of rape and oral copulation by intoxication is that the accused knew or reasonably should have known that the alleged victim was too intoxicated to consent. The court gave CALJIC No. 10.02 as follows:

> Every person who engages in an act of sexual intercourse with another person not the spouse of the perpetrator, and when the other person is prevented from resisting by any intoxicating, anesthetic, or controlled substance, *and this condition was known or reasonably should have been known by the accused*, is guilty of rape in violation of Penal Code Section 261(a)(3).
> In order to prove this crime, each of the following elements must be proved:
> 1. A male and a female engaged in an act of sexual intercourse;
> 2. The two persons were not married to each other at the time of the act [of] sexual intercourse;
> 3. The alleged victim was prevented from resisting the act by an intoxicating, anesthetic, or controlled substance; and
> 4. *This condition was known or reasonably should have been known by the accused.*

14

RT 948-49 (emphasis added).  Similarly, the court gave CALJIC 10.13 as follows:

> Every person who engages in an act of oral copulation with another person, and that other person is prevented from resisting by any intoxicating or controlled or anesthetic substance, *and this condition is known or reasonably should have been known by the accused*, is guilty of the crime of unlawful . . . oral copulation, in violation of Penal Code Section 288a(i).
> . . . .
> In order to prove this crime, each of the following elements must be proved:
> 1. A person engaged in an act of oral copulation with the alleged victim;
> 2. The alleged victim was prevented from resisting such act by any controlled or intoxicating or anesthetic substance; and
> 3. *This condition was known or reasonably should have been known by the accused*.

RT 949-50 (emphasis added).  Because these instructions unambiguously informed the jury that the prosecution had to prove that petitioner knew or reasonably should have known that Doe lacked the capacity to consent, there is no "reasonable likelihood" that CALJIC No. 10.65 deprived petitioner of the defense that he honestly and reasonably did *not* know that Doe lacked the capacity to consent.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde*, 494 U.S. at 380.

In addition to these other jury instructions, statements made by both trial counsel during their closing arguments helped cure any ambiguity CALJIC No. 10.65 may have created.  The prosecutor structured her closing argument around the very issue of whether petitioner knew that Doe was too intoxicated to give consent.  She told the jury that "the crux of the case" was that the jury "must find that . . . the condition of this mental state – that [Doe] was so intoxicated that she couldn't make a decision, a reasonable judgment in whether or not to have sexual intercourse, was known or reasonably should have been known by the defendant."  RT 982.  After a run-through of the evidence, the prosecutor concluded that "[a]ll of it points to that [petitioner] knew that [Doe] . . . was too intoxicated to give consent because he gave her the date-rape drug."  RT 989.

Similarly, defense counsel told the jury that the "two big questions" in the case were the allegations "[1] that the victim was unable to give consent because of

1   intoxicating or anesthetic substance or controlled substance, and [2] that the condition

2   was known or should have been known to the defendant, Mr. Garcia." RT 998.

3   At a few points later in his closing argument, defense counsel veered off-course by

4   echoing CALJIC No. 10.65's focus on consent over capacity.  He told the jury, for

5   example, that a "[r]easonable, good faith belief is a complete defense to the charge in

6   Counts 1 and 2. If you find that Will Garcia had a reasonable, good-faith belief that

7   consent was being given, you must find him not guilty." RT 1114.  But given that the

8   jury was instructed multiple times that an essential element of the crimes charged was that

9   petitioner knew or should have known that Doe lacked the capacity to consent, it is not

10  "reasonably likel[y]" that CALJIC No. 10.65 or defense counsel's sporadic echoing of it

11  would have misled the jury into ignoring that element.  *See Estelle*, 502 U.S. at 72 & n.4;

12  *Boyde*, 494 U.S. at 380.

13  The California Court of Appeal's rejection of petitioner's jury instruction claim was

14  not objectively unreasonable.  *See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to

15  federal habeas relief on this claim.

16  C.   Instructional Error in Giving CALJIC Nos. 3.30 and 4.36

17  Petitioner claims that the trial court deprived him of due process when it

18  instructed the jury pursuant to CALJIC Nos. 3.30 and 4.36.  *See* Pet. Attach. C at 24-27.

19  The trial court gave CALJIC Nos. 3.30 and 4.36 as follows:

20          When a crime requires general intent, there must exist a union or
            joint operation of act or conduct and general criminal intent.  General intent
21          does not require an intent to violate the law.  When a person does that
            which the law declares to be a crime, he is acting with general criminal
22          intent, even though he may not know that the act or conduct is unlawful.
            . . . .
23          When the evidence shows that a person voluntarily did that which
            the law declares to be a crime, it is no defense that he did not know that the
24          act was unlawful or that he believed it to be lawful.

25  RT 947-48.  Petitioner argues that these instructions negated the jury's consideration of

26  petitioner's defense that he reasonably believed that Doe had the capacity to consent to

27

28                                          16

1    the sex acts.

2       The California Court of Appeal rejected petitioner's claim because it found that

3    CALJIC Nos. 3.30 and 4.36 simply informed the jury that a defendant acts with general

4    criminal intent even if the prosecution does not prove that he was aware that rape and oral

5    copulation by intoxication are crimes.  Resp't Ex. C at 7-8.  The court concluded that

6    "[t]here was no danger that the jury would have found defendant guilty even if he

7    believed that Doe had given her consent . . . because the trial court also instructed the jury

8    pursuant to CALJIC No. 10.65."  Resp't Ex. C at 8.  As discussed earlier, other

9    instructions in addition to CALJIC No. 10.65 informed the jury that the prosecution had

10    to prove that petitioner knew or reasonably should have known that Doe lacked the

11    capacity to consent.  It is not "reasonably likel[y]" that the discussion of general criminal

12    intent in CALJIC Nos. 3.30 and 4.36 negated petitioner's defense that he reasonably

13    believed that Doe had the capacity to consent.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde*,

14    494 U.S. at 380.

15       The California Court of Appeal's rejection of petitioner's jury instruction claim was

16    not objectively unreasonable.  *See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to

17    federal habeas relief on this claim.

18       D.    <u>Erroneous Theory of Liability for False Imprisonment</u>

19       Petitioner claims that he was denied due process of law because the trial

20    court erroneously instructed the jury that it could convict petitioner of false imprisonment

21    on a violence theory.  Pet. Attach. C at 27-30.  The court instructed the jury on two

22    alternative theories of false imprisonment: violence and fraud or deceit.  *See* RT 951-53.

23    Petitioner argues that his alleged "leading" Doe to the bed, *see* RT 205, did not constitute

24    violence, defined for the jury as "the exercise of physical force used to restrain over and

25    above the force reasonably necessary to effect the restraint."  RT 952.  *See* Pet. Attach. C

26    at 29-30 (citing *People v. Matian*, 35 Cal. App. 4th 480, 484 (1995)).  Because the jury

27

28                           17

1    returned a general verdict that did not specify which theory it relied upon, petitioner

2    argues that the false imprisonment conviction must be reversed.  Pet. Attach. C at 30.

3           The California Court of Appeal rejected this claim on the ground that the evidence

4    was sufficient to satisfy the violence theory of false imprisonment under California law:

5    "Here defendant locked the door.  When Doe tried to unlock the door, he 'stopp[ed] her

6    hand from opening the door,' thus restraining her.  Defendant then used additional force

7    by 'grabbing' her arm and leading her away from the door to the bed.  This conduct

8    established physical force over and above the force necessary to effect the restraint.

9    Accordingly, the trial court did not instruct the jury on an erroneous theory of liability."

10   Resp't Ex. C at 8-9.  This court is bound by the state court's interpretation of state law.

11   *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (holding that a state court's interpretation

12   of state law binds a federal court sitting in habeas corpus).  Petitioner is not entitled to

13   federal habeas relief on his claim that the trial court instructed the jury on an erroneous

14   theory of liability under California law.

15          E.     Ineffective Assistance of Counsel for Failure to Modify CALJIC No. 10.65

16          Petitioner claims that he was deprived of the effective assistance of trial

17   counsel under the Sixth Amendment when his attorney failed to request a properly

18   modified version of CALJIC No. 10.65.  *See* Pet. Attach. D at 16-22.  According to

19   petitioner, in order to accurately capture his reasonable belief defense, defense counsel

20   should have requested the following modified instruction:

21          In the crimes of rape by intoxication and oral copulation by
             intoxication, general criminal intent must exist at the time of the
22          commission of the sex acts.  There is no general criminal intent if the
             defendant had a reasonable and good faith belief that the other person was
23          not so intoxicated that the person lacked the legal capacity to give consent.
             Legal capacity is the ability to exercise reasonable judgment, that is, to
24          understand and weight not only the physical nature of the act, but also its
             moral and probable consequences.
25
            Therefore, a reasonable and good faith belief that the other person
26          had the legal capacity to consent is a defense to rape by intoxication and
             oral copulation by intoxication.  If, after consideration of all of the
27

28                                              18

evidence, you have a reasonable doubt that the defendant had general criminal intent at the time of the sex acts, you must find him not guilty.

Pet. Attach. D. at 19 n.2.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction. *Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The failure of petitioner's trial counsel to request a modified version of CALJIC No. 10.65 did not constitute ineffective assistance of counsel. While the modified version

19

suggested in the petition may have been clearer than the unmodified version, counsel's performance did not fall below an "objective standard of reasonableness" under prevailing professional norms. *See Strickland*, 466 U.S. at 687-88. The "Use Note" following CALJIC No. 10.65 recommends that the instruction "should be given, when justified by the evidence, sua sponte, in prosecutions under Penal Code §§ 261[ and] 288a . . . ." CALJIC does not recommend that a modified version of No. 10.65 or any similar instruction be given specifically for §§ 261(a)(3) or 288a(i).

Importantly, defense counsel understood that the central issue in the case was capacity to consent rather than consent. He told the jury in his closing statement that the "two big questions" in the case were the allegations "[1] that the victim was unable to give consent because of intoxicating or anesthetic substance or controlled substance, and [2] that the condition was known or should have been known to the defendant, Mr. Garcia." RT 998. He strategized that CALJIC No. 10.65 would be useful in defending against these allegations. In his argument to the trial judge in support of using CALJIC No. 10.65, he stated: "This [instruction] is the whole case. It comes down to the legal capacity and the giving of consent are all intertwined. And whether he had a reasonable belief is all going to be a factual determination on the part of the jury. I mean, throughout his statement . . . he's saying he believed she gave consent. . . . [T]hat's one circumstantial factor . . . ." RT 567. Under these circumstances, it cannot be said that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 687-88.

Even if defense counsel's performance was deficient, petitioner has not shown prejudice. As discussed earlier, the jury was instructed multiple times – in the language of Counts 1 and 2 and CALJIC Nos. 10.02 and 10.13, and during both trial counsel's closing arguments – that in order to convict it had to find that petitioner knew or should have known that Doe lacked the capacity to consent. In view of the record as a whole, the court earlier concluded that it is not reasonably likely that CALJIC No. 10.65 would have

misled the jury into finding petitioner guilty even if it found that he reasonably believed that the victim had the capacity to consent. *See supra* at 16 (applying *Estelle*, 502 U.S. at 72 & n.4 and *Boyde*, 494 U.S. at 380). For essentially the same reasons, it cannot be said that there is a reasonable probability that, but for counsel's failure to seek a modification of CALJIC No. 10.65, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

The state court's rejection of petitioner's ineffective assistance claim was not objectively unreasonable. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to federal habeas relief on this claim.

F.    Ineffective Assistance of Counsel at Sentencing Hearing

Petitioner finally claims that his trial counsel's failure at the sentencing hearing to make meritorious objections to the victim restitution award constituted ineffective assistance of counsel. *See* Pet. Attach. D at 22-31. Petitioner argues that defense counsel failed to raise three meritorious objections: "(1) the record does not establish that Ms. Doe's loss was the 'result' of petitioner's criminal conduct; (2) there is a serious question as to whether Ms. Doe 'quit' her job; and (3) Ms. Doe is not entitled to restitution since she made no attempt to mitigate her loss by seeking psychological counseling." Pet. Attach. D at 24.

Petitioner's claim is without merit because there is no clearly established Supreme Court precedent governing ineffective assistance of counsel claims in the noncapital sentencing context. *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1244 (9th Cir. 2005). The claim is precluded by 28 U.S.C. § 2254(d). *See Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).

\\

\\

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:  June 27, 2008

_____
CHARLES R. BREYER
United States District Judge

22